W. H. Norris Lumber Company, Inc. v. Commissioner.
W. H. Norris Lumber Co., Inc. v. Commissioner
Docket No. 16314.
United States Tax Court
1948 Tax Ct. Memo LEXIS 71; 7 T.C.M. (CCH) 728; T.C.M. (RIA) 48204; October 12, 1948
*71 Robert Ash, Esq., Munsey Bldg., Washington, D.C., W. T. Durant, Esq., and E. E. C. Smith, C.P.A., for the petitioner. D. Louis Bergeron, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies: Declared Value
Year
Income Tax
Excess-Profits Tax
Excess Profits Tax
1943
$ 52.19
$ 667.71
1944
$220.58
2,345.16
1945
25.12
841.33
16,565.51
The issues for decision are whether the Commissioner erred in disallowing the excess over $33,000 claimed in 1945 as deductions for officers' salaries; and whether he erred in disallowing in part deductions claimed for depreciation of automotive equipment. Findings of Fact The petitioner, a corporation, filed its returns for the taxable years with the collector of internal revenue for the first district of Texas. Its accounts were kept, and its returns were filed, on an accrual basis. The petitioner was incorporated in 1901 and has since engaged in the wholesale and retail lumber business. Martha C. Norris, the widow and executrix of W. H. Norris, owns a controlling interest in the voting stock. Her two daughters *72 own small additional interests and together they own about 55 per cent. N. C. Hoyt owns about 17 per cent and G. D. Jacob owns about 10:5 per cent of the voting stock. Martha is a director but has never been an officer. She is not related to Hoyt or Jacob. N. C. Hoyt has been president of the petitioner since 1911 and G. D. Jacob has been vice-president since prior to 1920. Those two men are the principal executive officers of the petitioner. They closely supervise and control its operation and they have been largely responsible for its success. The only other officers were a secretary-treasurer who was not active and who drew no salary and an assistant secretary who handled the accounting and purchasing under the supervision of Hoyt and Jacob. The petitioner in 1911 had about four retail lumber yards throughout Texas. These increased to 30 in 1930. There have been 26 yards since 1938. Each yard is under the direction of a local manager and has considerable autonomy subject to the close supervision and control of Hoyt and Jacob. Each yard is required to send in frequent detailed reports at regular intervals, some reports being monthly, others weekly. Hoyt has general supervision *73 over the business of the petitioner and devotes most of his time to the retail business which he closely supervises. He makes several trips each year to suppliers and he personally goes over the reports of the yard managers. He corresponds with the managers and visits each yard about once every two months. He negotiated bank loans for financing the yard and also for financing saw mills which supplied lumber. Jacob is sales manager in addition to being vice-president. He took complete charge of the business whenever Hoyt was away. He also contacts suppliers and handles financial transactions. He is as capable as Hoyt in managing the business. The war caused an increase in the duties of Hoyt and Jacob during the taxable years. They had to visit many mills in order to procure materials which the petitioner was selling to the government. Their long established business connections enabled them to obtain materials which otherwise would not have been obtained. Hoyt studied government regulations and price schedules in order to compute price schedules for the retail yards. He also handled the renegotiation of the petitioner in 1943. Jacob made frequent trips in 1942 and 1943 to attend *74 auctions at which the government was purchasing materials for army camps. Hoyt and Jacob voluntarily reduced their own salaries, as well as those of the other employees of the petitioner, in 1931, 1932 and 1933. They increased all the salaries in 1936 or 1937 after consulting with Martha Norris. Many of the employees became dissatisfied during the war with their compensation because of the increased cost of living, and raises were necessary to hold them. Hoyt applied several times during the taxable years to the Salary Stabilizatoin Board for increases in the salaries and wages of the employees. His applications were approved in most instances. He and Jacob did not apply to the Board for increases in their own salaries, since they felt that to do so might jeopardize the increases sought for the employees. However, they discussed salary increases for themselves with Norris several times during the taxable years. The three of them felt that the added responsibilities of Hoyt and Jacob warranted increases in their salaries. Norris was familiar with the operation of the petitioner and had discussed its affairs and business policies with Hoyt and Jacob. The board of directors of the *75 petitioner held a specail meeting on December 20, 1945, and voted to pay Hoyt and Jacob additional compensation. The minutes of the meeting are in part as follows: "On motion of Mrs. Norris, seconded by Mr. Jacob and carried, additional compensation of $12,000 was voted to Mr. N. C. Hoyt, President, for the services for the years 1942, 1943, 1944 and 1945, which is at the rate of $3,000.00 annually for these four years when War time stabilization froze salaries of employees. "On motion of Mrs. Norris, seconded by Mr. Hoyt and carried, additional compensation of $12,000.00 was voted to Mr. G. D. Jacob, Vice-President, for services for the years 1942, 1943, 1944 and 1945, which is at the rate of $3,000.00 annually for these four years when War time stabilization froze salaries of employees." The stockholders of the petitioner at their annual meeting in January 1946 ratified that action of the directors. The petitioner deducted on its tax returns for 1945 the amounts of $27,000 and $24,000 as compensation paid to Hoyt and Jacob. The additional compensation voted by the directors at their special meeting was included in those amounts. The sales of the petitioner in many of the *76 years from 1925 through 1945 were over $3,000.000. They reached a low of less than $1,000,000 in 1932 and they were at a high of $3,700,000 in 1928 and 1941. They were $3,674,993 in 1945. They averaged more than $3,000,000 during the war years. Hoyt received a salary of $21,000 in 1919 and thereafter a salary of $20,000 until 1931. From then on until 1935 his salary was reduced from time to time until it was $10,200. It was $15,000 from 1937 through 1944 and $27,000 for 1945. Jacob's salary which was $17,500 in 1919 approximately paralleled that of Hoyt. It was $12,000 in 1937 to 1944 and $24,000 in 1945. The net profits of the petitioner varied substantially from 1919 through 1945. They were $259,570 for 1945. The lowest they were during the war years was $182,000. The petitioner paid dividends in most years from 1919 through 1945. The dividends for 1945 were in the amount of $40,000. They averaged substantially more than that during the war period. The Commissioner determined that reasonable compensation for services rendered in 1945 was $18,000 for Hoyt and $15,000 for Jacob. Reasonable allowances for salaries or other compensation paid or incurred in 1945 for personal services *77 actually rendered by Hoyt and Jacob are $27,000 and $24,000, respectively. The petitioner owned and utilized about 45 pieces of automotive equipment during the taxable years. Some of the items were purchased as early as 1933, 1938 and 1939. The petitioner has depreciated its equipment at the rate of 25 per cent of cost per year since 1935. The equipment did not have much salvage value from 1935 to 1941 after it had been fully depreciated. Shortages during the war caused the value of used automotive equipment to appreciate. The petitioner claimed the following deductions for depreciation of its automotive equipment: 1943
$7,124.33
1944
9,354.46
1945
7,474.34
The Commissioner adjusted the claimed deductions by determining an estimated salvage value for each unit and allowing deductions at the rate of 25 per cent of cost minus the salvage value. The estimated salvage value was 20 per cent of cost in most instances. The Commissioner allowed deductions for depreciation of the automotive equipment as follows: 1943
$5,396.16
1944
6,997.65
1945
5,194.09
Reasonable allowances for the exhaustion, wear and tear of the automotive equipment used *78 in the petitioner's business are as follows: 1943
$5,396.16
1944
6,997.65
1945
5,194.09
The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: Hoyt and Jacob had been responsible for the successful operation of the petitioner for many years and its prosperity during the taxable years was due largely to their efforts and decisions. Their success in obtaining scarce materials during the war was the result of their long established business contacts and their policy of financing saw mills. Their salaries remained constant from 1937 through 1944 in spite of substantial increases in their duties, in the cost of living, and in the sales and profits of the petitioner. The total compensation which the directors paid to each of them in 1945 was a reasonable allowance for salaries for personal services actually rendered by them, having in mind all of the circumstances disclosed by the evidence. . The petitioner complains that the Commissioner, in determining the deductions for depreciation, has reduced the cost of automotive equipment by too large a figure representing salvage *79 value. The petitioner deducted no salvage value whatsoever in its computations whereby it arrived at the amounts claimed for depreciation of this equipment. It deducted 25 per cent of cost in each year. The Commissioner does not object to the 25 per cent figure which reflects a useful life of four years, but he insists, in accordance with his regulations and the law, that salvage value be considered in computing reasonable deductions for depreciation of this equipment. The rule is correctly stated in Regulations 111, section 29.23(1)-1 that a reasonable allowance for depreciation is the amount which should be set aside for the taxable year so that the aggregate of amounts thus set aside, plus the salvage value, will at the end of the useful life of the property equal the cost or other basis. The record shows that in each of these taxable years it was apparent that the automotive equipment would have substantial salvage value at the end of its useful life. The petitioner has failed to show that the estimates of salvage value made by the respondent were out of line. Indeed, the evidence shows that those values were conservative as compared to amounts which the petitioner was actually *80 obtaining from the sales of completely depreciated equipment. Decision will be entered under Rule 50.